Price, J.
Numerous errors were assigned in the circuit court, and the same have been brought to this court by the petition in error. Prominent in the list is the declaration that the statute under which Kilbourne was indicted, tried and convicted is invalid. Its constitutionality was challenged by the demurrer to the indictment which the trial court overruled, and this ruling was complained of in the circuit court, and is forcibly assailed in this court.
If this statute is invalid, the indictment falls with it, as will .all the subsequent proceedings— the verdict and the sentence pronounced thereon. Therefore, we first address our attention to this very important question, leaving the other errors assigned to abide the result of our investigation. ,
The law in question was passed on May 9, 1908, and is found in 99 O. L., 464-5, and in Section 12561 of the General Code.
The entire section is: “Whoever, without authority, unlawfully removes from any railway track, over which locomotives or cars are operated, or from any locomotive, motor, or car, the bond- *250 wires, nuts, bolts, angle bars, spikes, attachments, fastenings, switch stands, locks, feed wires, trolley wires, or other appurtenances, or any part or attachment thereof, or any bonds, nuts, bolts, wires, fastenings .journal brasses, journal packing or parts thereto attached or belonging which are necessary in the use or operation of said railway tracks, locomotives, motors or cars, and the removal of which may endanger life, or whoever buys, receives, or unlawfully has in his possession any of the aforesaid articles, shall upon conviction thereof be imprisoned in the penitentiary not more than five years or less than one year, or not more than six months in the county jail or workhouse at the discretion of the court, which is hereby authorized to hear testimony in mitigation or aggravation of sentence.”
In the revision as found in the General Code, the language of the penalty is transposed and the authority to hear testimony in mitigation or aggravation is omitted.
The indictment on which Kilbourne was tried charges, that “On or about the twenty-sixth day of July, in the year of our Lord one thousand nine hundred and nine, within the county of Franklin aforesaid, unlawfully did buy certain journal brasses necessary in the use and operation of certain railroad cars, which said journal brasses had been theretofore unlawfully and without proper authority removed from said certain railroad cars, which said railroad cars and brasses were then and there the property of the Hocking Valley Railroad Company, a corporation, and which said removal of said journal brasses from said certain railroad *251 cars might have endangered life, contrary to the statute,” etc.
He was not charged with having removed the journal brasses from the cars, or with removing any article specified in this statute, from any track, locomotive, or other railroad property. His offense, if any, consists in buying journal brasses which had been unlawfully and without proper authority therefore removed by some one else.
Knowledge, or even suspicion, on the part of the buyer, that such brasses, nuts, bolts, et cetera, had been unlawfully removed from cars or other railroad property described in the statute, is not made a condition or element of the crime. In this respect, the clause or part of the section on which the prosecution is founded differs ' from the preceding provision, for the latter aims its prohibition against the principal actor — the one who without authority unlawfully removes from a railway track, and other species of railway property mentioned, any of the articles therein named.
The one who so removes has knowledge of what and from what he removes. The act of removal necessarily implies that he knows what he. is removing, and he is charged with knowledge of the relation which such articles bear to the railway property from which they are taken. Hence we assume that one who, without authority, removes any of the specified articles’from railroad'cars or other named railroad property, is possessed of both knowledge and intent, and therefore no constitutional objection can be made to that part of the section.
*252 But here, in the latter paragraph, is the fate of one who buys or receives, or has in his possession any ■ of such removed articles. The buying, receiving or. having in possession is made a crime, although the buyer, receiver or possessor has no knowledge or information that said article- or articles had been removed from any railway car, or other railway property. Knowledge is not made an ingredient of the offense as defined by this branch of the statute, and knowledge on the part 'of the accused.is not charged in the indictment.
Many of the articles named in the act are of common use — articles of common merchandise, .such as nuts, bolts, angle bars, spikes, attachments, fastenings. The others are not so common, and, as their names indicate are intended for railroad purposes, and yet their names do not make them contraband, for when worn out, or no longer fit or desired for railroad purposes, they are for sale and become legitimate subject of traffic. The trade in old or second-hand iron, and material of this and other classes, has grown to large proportions, and the dealer — the buyer of such cast-off wares, — should not be condemned by mere presumption, if he unwittingly purchases an article named in the statute, where he has no knowledge or information that it had been removed from some railroad car or other railway property. We understand that even journal brasses are not limited in use to railroad cars, but are in use in many manufacturing establishments of the country. Therefore the sight of journal brasses in the hands of a party could not of itself be evidence that they had been removed from railway cars or other railway *253 property. It is not claimed that there are any special marks or impressions on any of these goods to indicate or designate any particular former ownership.
Section 6856, Revised Statutes, defines the crime of larceny, and Section 6858 provides- that “Whoever buys, receives or conceals anything of value which has been stolen, taken by robbers, embezzled * * * knowing the same to have been stolen, taken by robbers, embezzled * * * shall be deemed guilty of larceny * * * ”
In framing the act under consideration, the legislature omits the word “knowing” and provides nothing in its place, enabling the state to convict without showing that the accused had knowledge of the, character of property he was buying. One may be innocent of a criminal intent' in buying articles named in the statute, and may have dealt with them in the usual course of trade, and yet be convicted if it turn out that they had been aj: some time by some person removed from a locomotive, motor, car, or other designated railway property.
•As early as Birncy v. The State, 8 Ohio Rep., 230, guilty knowledge was held to be a necessary ingredient of crime. It is true that that case arose • from the violation of a statute prohibiting' the harboring or secreting a slave. There were several-counts in the indictment, which we need not specialize further than to say that the statute forming the basis of prosecution provided that “if any person shall harbor secrete any black' or -mulatto' person, the property of another, the person' so of-r fending shall, on conviction thereof, be fined imanyl *254 sum,” etc. It is observed that scienter is not made part of the statutory description, and that fact was important in determining the case.
On page 238, Wood, J., speaking for the court, says: “There is no averment that the plaintiff in error knew the facts alleged, that Matilda was a slave, and the property of L. Larkin, or of any other person; and such is not the legal inference in a state whose constitution declares that all are born free and equal * * *. On the contrary, the presumption is in favor of freedom. The scienter, or knowledge of the plaintiff in error, of this material fact, was an ingredient necessary to constitute his guilt. This knowledge should have been averred in the indictment, and proved on the trial, for without such knowledge, theo act, charged as a crime was innocent in its character. We know of no case where positive action is held criminal, unless the intention accompanies the act either expressly or necessarily inferred from the act itself. It is true that the statute upon which the Indictment is founded omits the scienter, and the indictment avers all the facts enumerated in the statute. But this is not sufficient; it can not be assumed that an act, which, independent of positive enactment, involves no moral wrong, nay an act that in many cases would be highly praiseworthy, • should be made grievously criminal when performed in total unconsciousness of the facts that infect it with crime * *
We think this early pronouncement by this court is yet sound law and states a rule pertinent to the present controversy, and is as applicable to the business habits and rights of our citizens to-day *255 'a.s to the right of a citizen under the fugitive slave statute. The case has been approvingly noticed in Miller et al. v. The State, 3 Ohio St., 476, under our present constitution, and the principle distinctly reannounced in Farrell v. The State, 32 Ohio St., 456. The same legal light can be traced through many later cases decided by this court, which we need not cite.
- If it is said that the buyer should, before buying or receiving, make inquiry as to where or how the articles were obtained, we might be at a loss to tell of whom and1' where the inquiry should be made. It is not probable that the thief or party who removed the articles would inform the buyer that the property was stolen, but on the contrary would make such statement or give such account as would allay suspicion and indicate that the property had been honestly acquired. Had the buyer gone through the course of this precaution, and acted on the information thus given as to the history of the articles offered for sale, and believing the statement of the seller, purchased them, it would be no defense under this branch of the statute. Want of knowledge of the truth, however honestly and actively sought, furnishes no excuse, and the purchaser in good faith stands no better before this law than the thief himself. Why this drastic .legislation? And as to a certain class of property ?
Counsel .for the state answer in the language of the circuit court, where it is said, “the object of this statute is to break up any market for such commodity so removed from cars, and I might say here that is one of the strong.points that no doubt *256 influenced the supreme court and the circuit court in upholding the same question 'as made under the pure food laws — that is the question of knowledge.If there was no market value for any such com-modify, then' it would reduce to a minimum the temptation and desire on the part of any parties' to unlawfully remove any such material from rail'-road cars.”
But such statement does not satisfy the question we have here. Doubtless it is true that these-species of railroad property are the frequent subjects of unlawful depredations, and that the thefts and removals have become a crying evil. It may be also that similar depredations are committed in the homes and other buildings owned by our citizens, from which, night and 'day, prowlers remove and sell valuable gas and water pipes and other valuable plumbing. When - such articles are once removed, the thief will, if he -can, find a market for the illegal wares. To break up the market for ? gas and water pipe, should the legislature make |i_án innocent buyer a criminal?
'WEaF disposition do railway companies themselves make of their wornout journal brasses, bolts, nuts, etc., when no longer safe and fit for use? Dó they bury them out'of sight? In the exercise of economy, they may seek and help create á market for such -wares, and to destroy all market for such articles as are included in the list, is an undertaking that may tax the ability- of even the legislature.
The plaintiff in error may be rather a free buyer of second-hand iron, and what is called junk, and *257 on occasions may have purchased without due care for the rights of others, but when we look into the record in this case, it is seen that he never saw the journal brasses in question. They were, by some one, placed in barrels, taken to the railroad freight house in Columbus and billed to a firm in Cleveland. One, Brown by name, obtained a bill of lading for the goods and they were shipped to the Cleveland concern. In the afternoon of the day, this party appeared at the office of plaintiff in error and presented the bill of lading and offered to sell the goods it' represented. The plaintiff in error was not present at the time and the negotiations were with his bookkeeper. The evidence may be in conflict, but it tends to show that the bookkeeper declined to buy the goods, but consented to take the bill of lading and sell the same on commission. At all events, nothing was paid for the goods. After the party had left, plaintiff in error returned to the office and was informed by the bookkeeper of what had transpired. In the meantime, the officers of the law got trace of the shipment and overtook it at Cleveland and arrest followed for Kilbourne in this case. There is nothing in the record to show that either the bookkeeper or Kilbourne ever saw these journal brasses. They never were in their possession except by token of the bill of lading. On inquiry by the bookkeeper as to nature of the goods, they were described as goods not proscribed by the statute in question.
While we are not passing on the merit or weight of the evidence in the record, the above *258 facts serve to illustrate what might be the dealings of and what might befall a perfectly honest man under similar circumstances. We do not believe the legislature has constitutional authority to enact such legislation as the clause of the section upon which the indictment is predicated and therefore hold it invalid.
This' conclusion renders consideration of' other questions in the record unnecessary.
The judgments of the lower courts are reversed, the demurrer to the indictment sustained, and the plaintiff in error discharged.
Reversed. '
Davis, Shauck, Johnson and Donahue, JJ., concur.